UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

                    Plaintiff,                    Court File No. 18-cr-4 (1) (DWF/LIB)

        v.
                                                  **REPORT AND RECOMMENDATION**
Leo Wayne Cook,

                    Defendant.

This matter is before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, and upon Defendant's First Motion to Suppress Search of Defendant's Vehicle, [Docket No. 41]. The Court held a Motion Hearing on May 7, 2018, at which the parties requested the opportunity to submit supplemental briefing on the Motion. [Docket No. 52]. The supplemental briefing was completed on May 30, 2018, after which Defendant's First Motion to Suppress Search of Defendant's Vehicle, [Docket No. 41], was taken under advisement.

For the reasons set forth below, the Court recommends that Defendant's First Motion to Suppress Search of Defendant's Vehicle, [Docket No. 41], be **GRANTED**.

## I.    RELEVANT FACTS[1]

On October 9, 2016, Minnesota State Patrol Trooper Brad Dingman was on routine patrol on Highway 64 south of Akeley, Minnesota, when he saw a white van traveling at a high rate of speed. (Transcript of May 7, 2018, Motion Hearing (hereinafter referred to as "Transcript"),

---

[1] The information here comes from the May 7, 2018, hearing testimony, as well as, the Court's objective review of the State Patrol's video and audio recording of Trooper Brad Dingman's encounter with Defendant Cook. (Def. Exh. 1).

[Docket No. 69], 9, 12-13). After clocking the van traveling 66 miles per hour in a 55-mile-per-hour zone, Trooper Dingman activated his vehicle's lights and stopped the white van. (Id. at 13). Defendant Leo Wayne Cook was the sole occupant of the van. (Id.).

As Trooper Dingman approached the van, he saw that the right turn signal remained activated. (Id. at 14; see, also, Def. Exh. 1, 2:33-35). Trooper Dingman approached the van's passenger-side window, and when he looked inside the van, he testified he saw Zig-Zag rolling papers on the front passenger seat as well as "lots of snack foods, a pill bottle in the center console, and . . . two cell phones also sitting on the center console." (Transcript, [Docket No. 69], 14; see, also, Def. Exh. 1, 2:40-46).

Trooper Dingman would also testify that Defendant's hands were shaking, he appeared nervous, and Trooper Dingman claimed he smelled "a slight odor of nonburnt marijuana" coming from the van. (Transcript, [Docket No. 69], 14).

Trooper Dingman explained that he had stopped Defendant for speeding and asked where Defendant was coming from.[2] (see, also, Def. Exh. 1, 2:47-3:10). Defendant explained that he had been to a Walmart in St. Cloud to pay some money toward an item he had on layaway there. (Id. at 3:00-03). Having noted that Defendant was from Redby, MN, Trooper Dingman later testified that it was significant to him that Defendant said he had gone to the Walmart in St. Cloud because there were other Walmart stores closer to and more convenient to Defendant's point of origin. (Transcript, [Docket No. 69], 16-17, 29). When asked, Defendant told Trooper Dingman that he was headed home to Redby. (Def. Exh 1,  3:20-27).

Trooper Dingman obtained Defendant's driver's license, went back to his patrol vehicle, ran Defendant's name, and he prepared a warning citation for speeding. (Transcript, [Docket No.

---

[2] The undersigned notes that while the audio recording in Defendant's Exhibit 1 clearly recorded the voice of Trooper Dingman, Defendant's responsive statements are not so easily understood, as they are recorded at a very low volume and the ambient noise of the wind and passing traffic often overcomes Defendant's statements.

69], 14-15, 28; Def. Exh. 1, 3:50-8:25). The Trooper then returned to the van and explained the warning to Defendant. (Transcript, [Docket No. 69], 15; Def. Exh. 1, 8:28-8:51).

After giving Defendant the warning, Trooper Dingman asked Defendant if he minded if Trooper Dingman asked him "a [inaudible] more question," and Defendant apparently acquiesced. (Transcript, [Docket No. 69], 28-29; Def. Exh. 1, 8:55-56). Trooper Dingman again asked Defendant why he had not paid for his layaway item in Bemidji or online and why he was making the payment in St. Cloud. (Id. at 8:57-9:26). Defendant's responses are inaudible. (Id.).

At this point, Trooper Dingman asked Defendant whether there was marijuana in the van. (Id. at 9:27-31; Transcript, [Docket No. 69], 15-16). Trooper Dingman testified at the May 7, 2018, Motion Hearing that Defendant "kind of paused a little bit before answering, before he said no," and because of the pause, Trooper Dingman believed "a little bit" that Defendant was not being truthful. (Id. at 16). Trooper Dingman next asked how long it had been since Defendant "smoked anything." (Def. Exh. 1, 9:31-35). Again, Defendant's audio response is inaudible, but Trooper Dingman replied, "No? No cocaine? No Heroin? . . . You don't do drugs? . . . You don't have anything, any weapons in—in the van? . . . No?" (Id. at 9:35-48).

Trooper Dingman asked for consent to "take a quick look" in the van, and he later testified that Defendant "kind of redirect[ed the] question and [did] not actually answer[] yes or no to a consent." (Id. at 9:53-59; Transcript, [Docket No. 69], 17, 31). From the video and audio recording of the interaction, it appears to the undersigned that Defendant asked, "Is that necessary?" (Def. Exh. 1, 9:53-59). In any event, it is clear that Defendant did not consent at this point, because Trooper Dingman went on to explain: "[A] lot of people come down this road have drugs so I just want to make sure and then get you on your way." (Id. at 10:00-10). Defendant again declined to consent to a search of his vehicle, and Trooper Dingman continued

to talk to Defendant, stating that it was "just part of my job [inaudible] try and take drugs off the street. So instead of calling the dogs to come search your van and everything, I'm asking for your consent to take a quick look and then you can be on your way." (Id. at 10:55-11:08). Apparently, Defendant still did not consent, because Trooper Dingman persisted, explaining that it was "kind of suspicious" that Defendant drove to the Walmart in St. Cloud rather than going to the Walmart in Bemidji or Park Rapids, and again Trooper Dingman stated that "a lot of drugs come out of St. Cloud." (Id. at 11:08-12:13). Trooper Dingman then told Defendant that he did not want to "take up a whole lot of your time by holding you here, waiting for a K-9 to come." (Id. at 12:13-21). Defendant expressed disbelief that Trooper Dingman wanted to search the van simply because Defendant went to pay on a layaway item in St. Cloud. (Id. at 12:21-42).

Trooper Dingman once more stated that it was "kind of suspicious that you'd drive all the way down there in a minivan." (Id. at 12:42-52). When Defendant stated he did "not know why it matters," Trooper Dingman asked again, "Do you have drugs in the vehicle?" (Id. at 12:52-54). Defendant replied, "No, I don't." (Id. at 12:54-55). Trooper Dingman pointed out that if Defendant did not have any drugs in the van, the search would be quick and Defendant would be on his way. (Id. at 12:55-13:07). When Defendant still did not consent to a search, Trooper Dingman stated again that he was "asking for your consent to search instead of holding you here and wait for a K-9." (Id. at 15:16-24). Defendant and Trooper Dingman continued to speak to each other, and eventually, Defendant affirmatively said, "I ain't giving you permission to search the car, that's all I'm saying." (Id. at 17:12-21). Trooper Dingman replied, "When was the last time you did marijuana?" (Id. at 17:22-25). Defendant admitted that he had smoked marijuana the day before. (Id. at 17:25-38). Then Trooper Dingman asked, "Is there anything in the van I need to know about?" (Id. at 17:38-44). When Defendant did not respond, Trooper Dingman still

again stated that he was "giving [Defendant] respect" by talking to him "instead of keeping [Defendant] here longer" to wait for a K-9 officer to come, which would "take a while" and further delay Defendant getting home. (Id. at 17:44-18:05).

At that point, Defendant admitted that he "[had] a joint." (Id. at 18:05-08; Transcript, [Docket No. 69], 17). After expressing surprise that Defendant went through "all this hassle" over just a joint, Trooper Dingman asked if there was anything else in the van. (Def. Exh. 1, 18:05-19:26). Defendant's audio response, if any, was inaudible.

Trooper Dingman had Defendant step out of the vehicle. (Id. at 19:27-20:05; Transcript, [Docket No. 69], 18). After being patted down by Trooper Dingman, Defendant stood between the van and Trooper Dingman's patrol vehicle. (Def. Exh. 1, 20:05-23). Trooper Dingman asked again if he was going to find "anything" in the van, and Defendant shook his head and said, "No." (Id. at 20:23-52). He was not handcuffed, and Trooper Dingman retrieved Defendant's cigarettes from the van so that Defendant could smoke. (Id. at 20:52-21:15).

Trooper Dingman got into the van and began searching it. (Id. at 21:08). Approximately 90 seconds later, Trooper Dingman called for K-9 assistance. (Id. at 22:51-22:33).

Approximately 2 to 3 minutes later, K-9 officer Hubbard County Deputy Kruchowski arrived at the scene, as did an additional, off-duty Beltrami County K-9 officer. (Id. at 24:17-28; Transcript, [Docket No. 69], 19-20). Trooper Dingman explained to Deputy Kruchowski that Defendant was supposedly driving back to Redby from St. Cloud after putting money down on an item on layaway at the St. Cloud Walmart, that there was a pill bottle in the van, that Defendant had eventually produced a joint to Trooper Dingman, and that Defendant had two cell phones in the van. (Def. Exh. 1, 24:17-26:23). It is important to note here that on the audio of the stop, (Def. Exh. 1), Trooper Dingman makes no mention to the K-9 officers of the "odor of

5

nonburnt marijuana" in the Defendant's van upon his initial contact with Defendant as he would later testify to at the May 7th, hearing.

After Trooper Dingman spoke further with Defendant about the two cell phones, the location of a receipt for the layaway payment, and how much money was in Defendant's wallet, one of the K-9 officers at the scene[3] asked Defendant if he "ha[d] a problem with" the officer "running [his] dog in the [van]." (Id. at 27:23-27:56). Defendant shook his head in a negative fashion, and then he stated that he had some more marijuana in the van. (Id. at 27:56-28:11). When asked the amount and location of the additional marijuana,[4] Defendant stated that there was approximately 4 ounces of marijuana in a bag in the van. (Id. at 28:11-30). Defendant was allowed to return to the van to show the law enforcement officers where a bag containing the marijuana was located. (Id. at 28:30-46).

Trooper Dingman retrieved approximately 8 ounces marijuana that was in a plastic bag and was "tied just in between the driver and passenger seat" of the van. (Id. at 28:46-29:19; Transcript, [Docket No. 69], 21-22). Trooper Dingman then walked Defendant toward the rear of Trooper Dingman's car, out of the view of the patrol car camera, and it appears that Trooper Dingman handcuffed Defendant and placed him into the patrol car. (Def. Exh. 1, 29:19-30:13).

A K-9 was brought to go through the van, and it alerted behind the driver's seat and on the cigarette pack that had previously contained the joint that Defendant had already surrendered to Trooper Dingman. (Transcript, [Docket No. 69], 22; Def. Exh. 1, 32:00-34:43, 38:45-53). After the K-9 left the van, Trooper Dingman and the two additional deputies were in and around the van and the following conversation can be heard on the audio:

---

[3] The identity of the individual who asked these questions is not discernible from Defendant's Exhibit 1, nor is it clear from Trooper Dingman's testimony at the May 7, 2018, Motion Hearing.
[4] The identity of the individual who asked these questions is not discernible from Defendant's Exhibit 1; Trooper Dingman testified at the May 7, 2018, Motion Hearing that the speaker was Deputy Kruchowski. (Transcript, [Docket No. 20-21].

**Unknown Individual**: . . . Four ounces of marijuana . . . [inaudible]

**Unknown Individual**: I can't believe [we or you] didn't smell it.

**Unknown Individual**: I'm sick, but we should've smelled that.

**Unknown Individual**: Well, I mean he had his papers—rolling papers just right on the seat.

**Unknown Individual**: But you pegged it right away with, um, you don't drive that far when there's a Walmart in [inaudible]. So, you knew, you knew right away."

(Id. at 35:52-36:25).

Trooper Dingman then searched the area behind the driver's seat of the van, and he found a compartment containing a shaving kit bag that held three baggies of what turned out to be over 500 grams of heroin. (Transcript, [Docket No. 69], 22; Def. Exh. 1, 38:44-54). Defendant was then informed that he was under arrest; Defendant was ultimately charged with possession of heroin with intent to distribute. (Id. at 39:00-30; Transcript, [Docket No. 69], 22; see, also, Complaint, [Docket No. 1]).

On April 23, 2018, Defendant filed the present First Motion to Suppress Search of Defendant's Vehicle. [Docket No. 41]. The undersigned held a Hearing on the Motion on May 7, 2018, at which Trooper Dingman testified and Defendant's Exhibit 1—the video and audio recording from Trooper Dingman's  patrol vehicle on October 9, 2016—was admitted into evidence. (Minute Entry, [Docket No. 52]; Def. Exh. 1). As already set forth above, at the May 7, 2018, Motion Hearing, the parties requested the opportunity to submit supplemental briefing on the suppression issue, and the undersigned granted that request. (Id.). Briefing was completed on May 30, 2018, at which time the undersigned took the matter under advisement.

## II.    DEFENDANT'S FIRST MOTION TO SUPPRESS SEARCH OF DEFENDANT'S VEHICLE, [Docket No. 41]

Defendant now moves the Court for an Order suppressing all evidence obtained through the search of his vehicle. (Mem. in Supp., [Docket No. 63]). Defendant does not dispute that his

initial stop for speeding was justified. (Id. at 5). Defendant further concedes that following the conclusion of the traffic stop, it appears that he consented to continue verbal interaction with Trooper Dingman. (Id. at 6). However, Defendant argues that the consensual conversation transformed into a seizure under the Fourth Amendment as of the point in time when Trooper Dingman began intimating that if Defendant did not consent to a search of his vehicle, Defendant would be required to wait for a K-9 unit to arrive. This seizure, Defendant argues, was unconstitutional because, as of that time, Trooper Dingman had no articulable and reasonable suspicion of criminal activity as needed to justify the further detention. (Id. at 5-14).

In response, the Government does not directly address the extension of the traffic stop or whether such extension was consensual or was a non-consensual seizure. Rather, the Government argues that Trooper Dingman had probable cause to search the vehicle because he testified that when he first made contact with Defendant at the side of his vehicle, he detected the slight odor of unburnt marijuana, and because, by the later time of the actual search, Defendant had already "confirmed the presence of marijuana inside the automobile." (Mem. in Opp., [Docket No. 71], 4-6). Thus, the Government contends the alleged slight odor of unburnt marijuana upon initial contact provided probable cause for the later warrantless search of Defendant's vehicle under the automobile exception to the warrant requirement. (Id.).

## A. Standard of Review

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure under the Fourth Amendment. United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 1994). The traffic stop cannot be extended beyond the time reasonably required to complete its purpose, however, unless the extension is justified by consent or the reasonable suspicion of criminal activity. See, Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015); United States v. Williams, 796 F.3d 951, 957 (8th Cir. 2015). Reasonable suspicion must be supported by articulable facts, and although "'the likelihood of criminal activity need not rise to the level required for

probable cause,'" it must be more than a "'mere hunch.'" <u>United States v. Roberts</u>, 787 F.3d 1204, 1209 (8th Cir. 2015) (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002)).

<u>United States v. Preciado</u>, No. 17-cr-150 (SRN/FLN), 2018 WL 1634419, *2 (D. Minn. April 5, 2018).

Where an individual initially consents to the extension of a traffic stop, the encounter may nevertheless become non-consensual if "a reasonable person would [not] feel free to terminate the encounter." <u>See</u>, <u>U.S. v. Moss</u>, No. 4:08CR3020, 2008 WL 2859048, *8 (D. Neb. July 21, 2008) (citing <u>U.S. v. Drayton</u>, 536 U.S. 194, 202 (2002)); <u>see</u>, <u>also</u>, <u>U.S. v. Dortch</u>, 868 F.3d 674, 677 (8th Cir. 2017) ("'"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."'"). However, the fact that many individuals might reasonably feel as though they could not voluntarily terminate an encounter with law enforcement absent some implicit permission to do so is not controlling when determining whether an initially consensual encounter has become a seizure under the Fourth Amendment. The Eighth Circuit recently explained: "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" <u>Dortch</u>, 868 F.3d at 677 (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968)). The show of authority must go "beyond that inherent in [a law enforcement officer's] badge." <u>Id.</u>

### B. Analysis

Initially, it is important to precisely define the issues in the present Motion to Suppress. Defendant does not challenge the initial traffic stop for speeding. (Mem. in Supp., [Docket No. 63], 5). The Government focuses its opposition to the present Motion to Suppress by arguing that

the search by Trooper Dingman of Defendant's vehicle was permissible under the automobile exception to the Fourth Amendment's warrant requirement because Trooper Dingman testified that he "detected the odor of fresh marijuana early in the encounter" and because Defendant would, after repeated questioning, eventually admit to having a joint in the vehicle. (See, Mem. in Opp., [Docket No. 71], 4-7). It thus appears that the Government's position is that because the odor of fresh marijuana, which Trooper Dingman testified he smelled at the inception of the traffic stop, established probable cause to believe that there was marijuana in Defendant's vehicle, the later search, after the traffic stop had been completed, was permissible under the automobile exception to the Fourth Amendment's warrant requirement and Defendant's arguments regarding the extension of the interaction beyond the traffic stop are irrelevant. See, U.S. v. Mayfield, 678 Fed. Appx. 437, 439 (8th Cir. 2017) (acknowledging that "the odor of marijuana emanating from a vehicle provides probable cause to search the vehicle pursuant to the automobile exception to the Fourth Amendment's prohibition of warrantless searches and seizures").

Defendant argues that Trooper Dingman's credibility regarding his May 7th, hearing testimony that he smelled an odor of unburned marijuana at the inception of the traffic stop is undermined by the conversation recorded in Defendant's Exhibit 1 between the officers on scene at the time of the actual vehicle search with respect to their failure to smell the 8 ounces of unburned marijuana in the car prior to Defendant admitting it was there. (Mem. in Supp., [Docket No. 63], 11-12; Transcript, [Docket No. 69], 14, 24).

As the Government's position depends largely on whether the undersigned is persuaded by Defendant's contentions regarding Trooper Dingman's credibility, this issue will be addressed first.

"'The assessment of a witness's credibility is the province of the trial court.'" <u>Mayfield</u>, 678 Fed. Appx. at 439 (quoting <u>U.S. v. Heath</u>, 58 F.3d 1271, 1275 (8th Cir. 1995)). In the context of a motion to suppress evidence, the Court may consider consistencies and inconsistencies in the evidence before it, including a police officer's testimony, and determine whether such testimony is credible. <u>See</u>, <u>U.S. v. Jackson-Bey</u>, No. 17-cr-152 (JNE/HB), 2018 WL 2305680, *5-8 (D. Minn. April 9, 2018), <u>report and recommendation adopted at</u> 2018 WL 2305673 (May 21, 2018).

In the case presently before the Court, Trooper Dingman testified at the May 7, 2018, Motion Hearing that when he first approached Defendant's vehicle and "while standing at the window I saw Zig-Zags sitting on the front passenger seat. . . . I could also smell nonburnt marijuana coming from the vehicle." (<u>Id.</u> at 14). Trooper Dingman also testified that "[w]hen [he] smelt [sic] the nonburnt marijuana, it changed [from a traffic stop] to a narcotics investigation at that point." (<u>Id.</u> at 23). Trooper Dingman similarly testified that he continued his interaction with Defendant after completion of the traffic stop "[b]ecause [he] was still investigating the possible marijuana in the vehicle." (<u>Id.</u> at 15). Trooper Dingman again referred to his claim of initially having detected the odor of unburned marijuana when testifying to (1) his reasons for disbelieving Defendant's statements that there were no drugs in the vehicle, (2) his intent to search the vehicle; and (3) the significance of Defendant's eventual admission that he had a joint in the vehicle. (<u>Id.</u> at 16 (Trooper Dingman thought Defendant might be lying because of "[t]he odor of the nonburnt marijuana"); 17 (Trooper Dingman's intent was "[t]o pull him out and search the vehicle due to the odor"); 17-18 ("I could smell nonburnt marijuana and not just the burnt marijuana on top of that")). Finally, when specifically asked, "[W]hy were you going to search the vehicle?" Defendant replied, "Because of the odor of the marijuana." (<u>Id.</u> at 18).

Also at the May 7, 2018, Motion Hearing, defense counsel questioned Trooper Dingman about a conversation which shows Trooper Dingman and the two additional deputies talking recorded on Defendant's Exhibit 1. (Id. at 42). The undersigned has thoroughly and repeatedly viewed this portion of the recording. Although the specific identities of the speaker for every statement are not determinable on the video recording, the following audio is readily discernible:

> **Unknown Individual**: . . . Four ounces of marijuana . . . [inaudible]
> **Unknown Individual**: I can't believe [we or you] didn't smell it.
> **Unknown Individual**: I'm sick, but we should've smelled that.
> **Unknown Individual**: Well, I mean he had his papers—rolling papers just right on the seat.
> **Unknown Individual**: But you pegged it right away with, um, you don't drive that far when there's a Walmart in [inaudible]. So, you knew, you knew right away."

(Id. at 35:52-36:25). Trooper Dingman further testified at the May 7, 2018, Motion Hearing that he did not remember who said, "I can't believe [you or we] didn't smell it"; he thought that "one of the other deputies" made the statement "We should've smelled that"; and the final speaker was "the deputy" talking to Trooper Dingman. (Transcript, [Docket No. 69], 42-43).

After careful consideration of the entire record before the Court, and repeated viewings of Defendant's Exhibit 1, the undersigned finds that Trooper Dingman's repeated testimony at the May 7, 2018, Motion Hearing that he smelled the slight odor of unburnt marijuana at the inception of the traffic stop is not entirely credible.

Despite Trooper Dingman's testimony that the initially detected odor of unburnt marijuana was the driving force behind his continuing interaction with Defendant after the conclusion of the traffic stop, which interaction he characterized at the May 7, 2018, Motion Hearing as a "narcotics investigation," the totality of the record simply does not support this

testimony.[5] The objective video and audio recording of the encounter submitted to the Court as Defendant's Exhibit 1 actually undermines Trooper Dingman's hearing testimony on this critical point, and for the following reasons, the undersigned finds the video and audio to be persuasive, not Trooper Dingman's testimony at the May 7, 2018, Motion Hearing.

First, the undersigned notes that Trooper Dingman <u>never</u> mentioned the odor of marijuana during his conversations with Defendant, although he provided other explanations to Defendant of why he wanted consent to search Defendant's vehicle, such as finding it suspicious that Defendant chose to drive to St. Cloud to go to Walmart and Trooper Dingman's desire to "take drugs off the street." (<u>See</u>, Def. Exh. 1, 10:55-58, 11:08-12:13). Nor does Defendant's Exhibit 1 reflect that Trooper Dingman ever mentioned the initial odor of marijuana when he called for K-9 assistance, although he explained to the K-9 officer that Defendant "has a joint and [a] time before he had a K-9 hit on some money, I don't know if you're close and wanted to try." (21:52-22:39).

Even more telling, when the additional K-9 officers first arrived on scene and Trooper Dingman was relating the material circumstances of his encounter with Defendant thus far, he again made <u>no</u> mention of initially detecting any odor of unburned marijuana, even though he described to them other circumstances involved in the situation, such as the origin and destination of Defendant's travels, that Defendant asserted he had been to St. Cloud to put money down on a layaway item at Walmart, that there was a pill bottle in Defendant's vehicle,

---

[5] Moreover, the undersigned also notes that Trooper Dingman's testimony at the May 7, 2018, Motion Hearing was not supported by Defendant's Exhibit 1 in other respects. For example, Trooper Dingman testified that when he initially asked whether there was marijuana in Defendant's vehicle, Defendant "kind of paused a little bit before answering, before he said no," which made Trooper Dingman believe "a little bit" that Defendant was not being truthful. (Transcript, [Docket No. 69], 16). However, the video and audio recording of the actual traffic stop, Defendant's Exhibit 1 reflects no such pause. (Def. Exh. 1, 9:31-35).

that Defendant had eventually produced to Trooper Dingman a joint, and that Defendant had two cell phones in his vehicle. (Id. at 24:17-26:23).

Finally, the undersigned agrees with Defendant that the conversation recorded between the officers on scene after the discovery of 8 ounces of unburned marijuana regarding their failure to previously smell the unburned marijuana found in Defendant's vehicle seriously undermines the credibility of Trooper Dingman's later hearing testimony that he smelled unburned marijuana at the very beginning of his traffic stop of Defendant and was acting on that detection all times thereafter. The Government is correct that it is not entirely possible to identify with any certainty from the audio and video recording the speakers of each statement in this conversation among the officers. Nevertheless, it is clear from Defendant's Exhibit 1 that at the time of the recorded conversation in question, all three law enforcement individuals then present, Trooper Dingman, Deputy Kruchowski, and the additional Beltrami County deputy, were participating in that conversation. The undersigned notes that it is clear from the audio recording that one individual made the statement "I can't believe [we or you] didn't smell it" and a second, different individual made the statement "I'm sick, but we should've smelled that." However, it is reasonable to conclude that during such a conversation about the failure to smell unburned marijuana, any individual if they in fact had actually smelled the odor in question would have spoken up and stated that he had in fact smelled the unburned marijuana. Trooper Dingman's failure to assert at that point that he had smelled unburned marijuana during his initial interaction with Defendant, while not conclusively establishing that he did not smell unburned marijuana, is germane to a determination by this Court of his credibility.

Simply put, there is no evidence in the recorded material that supports Trooper Dingman's hearing testimony that he smelled an odor of unburned marijuana early on in his

interactions with Defendant. Instead, there is only evidence in the record that undermines the credibility of such testimony.

Therefore, the undersigned finds incredible and disregards Trooper Dingman's hearing testimony that he smelled the odor of unburned marijuana at the beginning of the traffic stop of Defendant.

The Government nonetheless further argues that probable cause to search Defendant's vehicle ultimately existed due to Defendant's later admission to and his production of a joint in the vehicle. Once Defendant produced a joint and gave it to Trooper Dingman from inside the vehicle, the undersigned agrees there could have been probable cause to search the vehicle. See, e.g., U.S. v. Englehart, 811 F.3d 1034, 1042 (8th Cir. 2016) ("[W]hen [the defendant] told [the officer] there was marijuana in his vehicle, [the officer] had probable cause to search the vehicle for drugs."). However, Defendant did not produce the joint until well after the conclusion of the traffic stop and Trooper Dingman's lengthy and persistent efforts to try to obtain consent to search the vehicle from Defendant.

Defendant concedes that his initial interaction and conversation with Trooper Dingman after the conclusion of the traffic stop was consensual in nature. (Mem. in Supp., [Docket No. 63], 6). Therefore, the pivotal questions for analysis of the present Motion to Suppress are (1) whether the initially consensual encounter beginning at the conclusion of the traffic stop became a seizure as contemplated by the Fourth Amendment prior to Defendant producing the joint for Trooper Dingman and, (2) if it did, whether Trooper Dingman had at that time the reasonable suspicion of criminal activity required for Trooper Dingman to detain Defendant.

### i. Whether a Seizure Occurred

The traffic stop concluded at the 8:55 mark of the video recording of the stop, Defendant's Exhibit 1, after Trooper Dingman issued Defendant the warning citation for speeding and concluded the "mission" of the traffic stop. See, Mosley, 787 F.3d 253 ("When conducting a traffic stop, the 'mission' of stopping the vehicle is to address a traffic violation and related safety concerns."). Defendant contends that the encounter became a non-consensual "seizure" under the Fourth Amendment at the time Trooper Dingman "informed him he would have to wait for the canine to arrive or consent to the search." (Mem. in Supp., [Docket No. 63], 6) (emphasis added). The Government does not address whether the interaction between Defendant and Trooper Dingman after the conclusion of the traffic stop was consensual. (Mem. in Opp., [Docket No. 71]).

> "A seizure does not occur simply because a law enforcement officer . . . asks a few questions or requests permission to search an area—even if the officer has no reason to suspect the individual is involved in criminal activity—provided the officer does not indicate that compliance with his request is required."

U.S. v. Ibrahim, No. 13-cr-207 (2) (SRN/TNL), 2014 WL 5860388, *6 (D. Minn. Nov. 12, 2014) (quoting U.S. v. White, 81 F.3d 775, 779 (8th Cir. 1996)).

Defendant compares the circumstances in the present case to those found in U.S. v. Jones, 269 F.3d 919, 922 (8th Cir. 2001), and U.S. v. Beck, 140 F.3d 1129 (8th Cir. 1998). (Mem. in Supp., [Docket No. 63], 7-9). In Beck, a police officer pulled over the defendant's vehicle for an observed traffic infraction. 140 F.3d at 1132. A check on the defendant's driver's license and criminal history revealed that his driver's license was valid and he had no criminal history. Id. The police officer issued a verbal warning for the traffic infraction, then told the defendant he was free to go. Id. After starting to walk away from the defendant's car, the police officer turned back and asked whether the defendant had any guns, drugs, or knives in his vehicle. Id. When the defendant said no, the police officer asked if he could conduct "a quick

search" of the vehicle. Id. After the defendant and the police officer "engaged in further discussion over why [the officer] wanted to search [the defendant's] automobile," the police officer radioed for a K-9 officer to assist him. Id. While waiting for the K-9 officer to arrive, the defendant asked what would happen if he refused to consent to a search of his vehicle. Id. The police officer replied "by telling him that while no search would occur, a drug dog would be led around the outside of" the defendant's vehicle. Id. The defendant declined to consent to a search of his vehicle. Id. The K-9 unit eventually arrived and, after the K-9 alerted outside the defendant's vehicle, drugs were found inside. Id. at 1132-33.

When the Eighth Circuit in Beck took up the issue of whether the drugs found in the defendant's car "should have been excluded because the search that uncovered [them] was the tainted fruit of an unreasonable detention," it first held that, after the conclusion of the business of the traffic stop, the ongoing encounter between the defendant and the police officer was consensual in nature. Id. at 1134-35. However, of import for purposes of the present case, the Eighth Circuit further held that the encounter became non-consensual when the defendant asked what would happen if he refused to consent to a search of his vehicle and the police officer informed him that if he refused to consent, a K-9 unit would conduct a sniff of his vehicle. Id. at 1135. The Eighth Circuit stated:  "[W]e do not believe a person in [the defendant's] situation, who had been present when a canine unit had been summoned to the scene and was then told by [the police officer] that he was going to have a canine unit conduct a drug sniff of [the defendant's] car, would reasonably have felt free to leave." Id. at 1135-36. Thus, at that point, the interaction became a seizure that implicated the defendant's Fourth Amendment rights. Id.

In Jones, the Eighth Circuit again addressed the issue of whether an initial consensual interaction between an individual and law enforcement remained consensual. The defendant in

Jones was pulled over by a Highway Patrol trooper after the trooper noticed the defendant driving below the minimum speed limit and the trooper saw the wheels of the camper the defendant was towing cross the dividing lines of the interstate. 269 F.3d at 922. Upon the trooper's request, the defendant sat in the trooper's patrol vehicle while the trooper checked the defendant's driver's license and criminal history. Id. at 922-23. After the results came back from dispatch, the trooper gave the defendant a warning for the traffic infractions, and the defendant got out of the patrol car and began to walk back to his own vehicle. Id. at 923. The trooper followed him and began to ask more questions. Id. The trooper asked whether there was contraband or narcotics in the camper and, when the defendant said there was not, the trooper asked for permission to search the camper, which the defendant denied. Id. "In response, [the trooper] told [the defendant] that he was going to call in a canine narcotics unit to inspect the camper." Id. In the defendant's presence, the trooper then called for a K-9 unit, which arrived approximately 1 hour later; at no time did the trooper tell the defendant he was free to leave. Id. Ultimately, after an alert by the searching drug dog, law enforcement found illegal pornography, but no narcotics, in the camper. Id. at 924.

The Eighth Circuit in Jones first considered whether the extension of the interaction beyond the initial traffic stop constituted a seizure within the meaning of the Fourth Amendment. Id. at 925. Considering the totality of the circumstances underlying Jones, the Eighth Circuit concluded that the encounter "appears to us to be a situation where a motorist submitted to a show of authority by an officer who made it evident from his use of language and conduct that the motorist would not be free to leave without first complying with the officer's demands." Id. at 926. Comparing the circumstances in Jones to those present in Beck, the Eighth Circuit held that Jones "presents an even stronger case for finding a 'seizure'" based in part on the facts that

the trooper in <u>Jones</u> never indicated to the defendant that he was free to leave, the defendant's denial of permission to search the camper "indicat[ed] that [the defendant] did not want to cooperate." <u>Id.</u> The Eighth Circuit concluded that the trooper's "use of declarative language and his nonresponsiveness to [the defendant's] desire to not have his camper/home inspected would lead a reasonable person to conclude that this encounter was not consensual, and that compliance with the officer's wishes would be compelled." <u>Id.</u> Accordingly, as in <u>Beck</u>, the Eighth Circuit found that the circumstances in <u>Jones</u> constituted a "seizure" within the meaning of the Fourth Amendment. <u>Id.</u>

In the present case, Defendant argues that Trooper Dingman's ignoring Defendant's <u>repeated</u> denials of the Trooper's requests for consent to search his vehicle is similar to <u>Jones</u>, as are Trooper Dingman's declarations that Defendant could either consent to the search or be detained to wait for a K-9 unit. (Mem. in Supp., [Docket No. 63], 9). As already stated above, the Government does not address whether the initially consensual interaction post-traffic stop ever became a non-consensual "seizure."

The undersigned finds that following relevant statements occurred after the traffic stop ended but prior to Defendant initially producing the marijuana joint to Trooper Dingman:

- Approximately 1 minute after the conclusion of the traffic stop, Trooper Dingman asked for consent to "take a quick look in the van," and Defendant declined. (Def. Exh. 1, 9:53-59);

- Approximately 2 minutes after the conclusion of the traffic stop, Trooper Dingman stated, "[It is] just part of my job [to] try and take drugs off the street. So instead of calling the dogs to come search your van and everything, I'm asking for your consent to

take a quick look and then you can be on your way." Defendant again declined to give consent. (Def. Exh. 1, 10:55-11:08).

- Approximately 3 minutes and 20 seconds after the conclusion of the traffic stop, Trooper Dingman stated: "[I don't want to] take up a whole lot of [Defendant's] time by holding you here, waiting for a K-9 to come." (Def. Exh. 1, 12:13-21).

- Approximately 4 minutes after the conclusion of the traffic stop, Trooper Dingman asked again whether Defendant had "drugs in the vehicle," and when Defendant replied, "No, I don't," Trooper Dingman stated that if there were no drugs in the vehicle, the consent search would be quick and Defendant would be on his way. (Def. Exh. 1, 12:52-13:07).

- When Defendant continued to refuse to consent to a search of the vehicle, at approximately 5 minutes and 20 seconds after the conclusion of the traffic stop, Trooper Dingman reiterated:  "[I am] asking for your consent to search instead of holding you here and [*sic*] wait for a K-9." (Def. Exh. 1, 15:16-24).

- Approximately 8 minutes and 20 seconds after the conclusion of the traffic stop, Defendant clearly stated:  "I ain't giving you permission to search the car, that's all I'm saying." (Def. Exh. 1, 17:12-21).

- Approximately 8 minutes and 40 seconds after the conclusion of the traffic stop, Trooper Dingman asked, "Is there anything in the van I need to know about?" When Defendant did not respond, Trooper Dingman stated that he was "giving [Defendant] respect" by talking to him "instead of keeping you here longer" to wait for a K-9 officer to come, which would "take a while" and further delay Defendant getting home. (Def. Exh. 1, 17:44-18:05).

Under the guidance set forth in <u>Jones</u> and <u>Beck</u>, the undersigned concludes that the consensual post-traffic stop interaction in the present case quickly became a seizure under the meaning of the Fourth Amendment at the very latest approximately 5 minutes and 20 seconds after the conclusion of the traffic stop, when Trooper Dingman informed Defendant that he was "asking for [Defendant's] consent to search <u>instead of</u> holding [him] here and [*sic*] wait for a K-9." (Def. Exh. 1, 15:16-24) (emphasis added). This statement presented Defendant's options as (1) consent to the search, or (2) wait for a K-9 unit to come and sniff the vehicle. Such presentation was reinforced by Trooper Dingman's other statements, in which he reinforced the idea that these were Defendant's only two available options, and he emphasized how long it would take for a K-9 unit to arrive. Although Trooper Dingman did not explicitly inform Defendant that if he refused to consent, a drug dog "would" search his vehicle, such intent was the clear import behind Trooper Dingman's statements. Moreover, as in <u>Jones</u>, Trooper Dingman was nonresponsive to Defendant repeatedly declining to give consent to the search, and Trooper Dingman at no point told Defendant he was free to leave.

When the totality of the circumstances are considered, Trooper Dingman's repeated representations to Defendant that his options were either consent to search or waiting for a K-9 unit, as well as Trooper Dingman's nonresponsiveness to Defendant's repeated refusals to consent "would lead a reasonable person to conclude that . . . compliance with the officer's wishes would be compelled." <u>See</u>, <u>Jones</u>, 269 F.3d at 926. Moreover, these circumstances, in conjunction with Trooper Dingman's continued physical posture of leaning on Defendant's vehicle throughout the interaction, lead the undersigned to conclude that a person in Defendant's situation would not have reasonably felt free to leave. Thus, as occurred in <u>Jones</u>, the present case is "a situation where a motorist submitted to a show of authority by an officer who made it

21

evident from his use of language and conduct that the motorist would not be free to leave without first complying with the officer's demands." See, 269 F.3d at 926. Thus, the encounter became a seizure within the meaning of the Fourth Amendment and it was no longer consensual. Because this transformation occurred prior to Defendant surrendering the joint to Trooper Dingman, the full search of the vehicle may only be justified by the surrender of the joint if the prior seizure of Defendant was permissible under the Fourth Amendment.

### ii. Articulable Suspicion of Criminal Activity

The Fourth Amendment requires that the aforementioned "seizure" of Defendant—after the conclusion of the initial traffic stop and the initial post-traffic stop consensual encounter between Defendant and Trooper Dingman—must be based upon a "reasonable, articulable suspicion that criminal activity is afoot." See, Jones, 269 F.3d at 927.

> "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." The Court must consider "the totality of the circumstances" when Determining whether an "officer has a particularized and objective basis to suspect wrongdoing."

U.S. v. Reyes, No. 17-cr-40 (RHK/FLN), 2017 WL 4047954, *5 (D. Minn. July 31, 2017) (citations omitted), report and recommendation adopted at 2017 WL 4022408 (D. Minn. Sept. 12, 2017). Moreover, in the context of the extension of a lawful traffic stop such as the one in the present case, "if the response of the detainee [during the traffic stop] and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." Jones, 269 at 926-27.

Defendant contends that Trooper Dingman had no reasonable, articulable suspicion at the time the encounter became a seizure that justifies Trooper Dingman's seizure of Defendant. (Mem. in Supp., [Docket No. 63], 9-14). The Government makes no response specifically to this

argument, instead relying solely on its assertion that the later vehicle search itself was justified by the automobile exception to the warrant requirement of the Fourth Amendment.

At the May 7, 2018, Motion Hearing, Trooper Dingman articulated the following observations that made him suspicious of criminal activity:  rolling papers on the front passenger seat, Defendant's hands were shaking and he appeared nervous, there were "lots of snack foods," a pill bottle and two cell phones were visible in the center console, and Trooper Dingman smelled the "slight odor of nonburnt marijuana,". (Transcript, [Docket No. 69], 14). Moreover, Trooper Dingman testified that he found important Defendant's statement that he was coming from St. Cloud, where he had been to put money down on an item on layaway at the Walmart there, and returning home to Redby. (Id. at 16-17, 28-29). According to Trooper Dingman, St. Cloud is "a major drug city. A lot of people travel to and from there getting large amounts of narcotics." (Id. at 16). Moreover, Trooper Dingman doubted Defendant's asserted justification for the trip to St. Cloud, noting that there were Walmarts located closer to Redby. (Id. at 17, 28-29).

Setting aside Trooper Dingman's testimonial assertion that he smelled the odor of unburned marijuana as not credible for the reasons already set forth above, the remaining circumstances, even considered in their totality, do not provide a sufficient basis for Trooper Dingman to form a reasonable and articulable suspicion that Defendant was engaged in criminal activity to justify the "seizure" now at issue.

Specifically, although nervousness can be a pertinent factor in determining the existence of reasonable suspicion, see, U.S. v. Quinn, 812 F.3d 694, 699 (8th Cir. 2016), the Eighth Circuit has also noted that "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." See, Beck, 140 F.3d at 1139. In the

present case, the only specific reasoning Trooper Dingman gave to support his assertion that Defendant "appear[ed]" nervous was that Defendant's hands were shaking. Trooper Dingman did not testify as to whether Defendant appeared more or less nervous than the average individual experiencing a traffic stop, and the weight to be given to Defendant's "nervous" appearance is, at best, minimal, if any at all.

Turning next to the fact that there were two cell phones in the vehicle, there is nothing inherently suspicious in this day and age about an individual owning multiple electronic devices. Many individuals choose to carry separate cell phones for work use and personal use, or for various other innocent reasons.[6] Similarly, to the extent that Defendant's Exhibit 1 shows Trooper Dingman expressed a belief that Defendant's driving a mini-van was suspicious, the undersigned observes that the type of vehicle being driven by Defendant adds nothing of substance to the equation. Mini-vans are a ubiquitous mode of transportation mass-marketed and likely to be found on virtually every residential block; which renders the fact that Defendant happened to be driving one meaningless.

With respect to Trooper Dingman's concern that Defendant was driving from St. Cloud to Redby, the undersigned notes that the Eighth Circuit has held that the origin and destination of travel, while not entirely irrelevant, are not generally a dispositive genesis for reasonable suspicion of criminal activity. See, Beck, 140 F.3d at 1137-38 (noting that geography could be relevant, but also collecting cases stating that origin of traveler or package from a "known drug center" or a "'drug source' city" was inadequate to support reasonable suspicion of criminal activity). The undersigned further notes that travel between two cities in Minnesota, regardless of the distance or the inconvenience of the drive as perceived by law enforcement, is not in and of itself an inherently suspicious activity, nor is choosing to place an item on layaway at a store that

---

[6] The undersigned Magistrate Judge notes that he himself has both a work cell phone and a personal cell phone.

24

is not the most objectively, geographically convenient location of that chain of stores when considered in relation to one's home.

The Eighth Circuit has also held: "the mere presence of fast-food wrappers in [a vehicle] is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity."[7] Beck, 140 F.3d at 1138. Moreover, Trooper Dingman did not explain why the presence of "lots of snack foods" in Defendant's car was notable to him.

The undersigned is aware that when determining whether reasonable, articulable suspicion of criminal activity was present to justify an investigatory seizure under the Fourth Amendment, the Court must consider the totality of the circumstances and, in some cases, "the sum may amount to more than its parts." See, Jones, 269 F.3d at 929. However, in the present case, when the totality of the circumstances articulated by Trooper Dingman as justification for the post-traffic stop investigatory seizure of Defendant are considered, even in sum, they do not support a finding of reasonable suspicion of criminal activity sufficient to warrant Defendant's detention beyond the Defendant's repeated refusals to grant Trooper Dingman consent to search his vehicle. Accordingly, the investigative detention and seizure of Defendant was conducted in violation of the Fourth Amendment.

"Ordinarily, evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against the victim of the illegal . . . seizure." U.S. v. Houck, 888 F.3d 957, 959 (8th Cir. 2018). To the extent that exceptions to the exclusionary rule might apply to prevent the suppression of the evidence obtained in the present case after the unlawful detention began, the Government does not assert

---

[7] In Beck, the Eighth Circuit noted that "[t]he district court judge, himself, admitted to having fast-food trash in his truck during trips." 140 F.3d at 1138. Similarly, the undersigned Magistrate Judge admits in the present case that his own personal vehicle is not the most clean and probably contains several snack food wrappers.

any argument whatsoever that the exclusionary rule should not apply. Thus, no exception to the exclusionary rule should be considered, as the Government makes no argument to the contrary. See, U.S. v. Sukhtipyaroge, No. 17-cr-208 (WMW/SER), 2018 WL 1726266, * (D. Minn. April 10, 2018) ("Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule, Herring v. U.S., 555 U.S. 135, 139 (2009), unless the government proves by a preponderance of the evidence that an exception to the exclusionary rule applies, Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Kennedy, 427 F.3d 1136, 1144 (8th Cir. 2005).").[8]

### III.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's First Motion to Suppress Search of Defendant's Vehicle, [Docket No. 41], be **GRANTED**.


Dated: June 19, 2018                                                s/Leo I. Brisbois
                                                                              The Honorable Leo I. Brisbois
                                                                              United States Magistrate Judge

---

[8] Even if the Government had asserted that an exception to the exclusionary rule applied to the present circumstances, the undersigned would disagree. With respect to the exception to the exclusionary rule known as the attenuation doctrine, the Court must determine """"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."""" U.S. v. Smith, 715 F.3d 1110, 1116 (8th Cir. 2013) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)). In the circumstances underlying the present Motion to Suppress, the discovery of the drugs that Defendant now seeks to suppress was solely derived as a direct result of his continued presence at the scene and his continuing interactions with Trooper Dingman. If such presence and interactions were unconstitutional, the evidence must be suppressed.

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.